**Jack Howard POTTS, Petitioner-Appellant,**

v.

**Walter ZANT, Warden, Georgia Diagnostic and Classification Center, Respondent-Appellee.**

**Jack Howard POTTS, Petitioner-Appellant,**

v.

**Sam AUSTIN, Respondent-Appellee.**

**Nos. 80–7476, 80–7477, 80–7664 and 80–7665.**

United States Court of Appeals, Fifth Circuit.

Unit B

Feb. 17, 1981.

Rehearing and Rehearing En Banc Denied March 23, 1981.

---

Susan V. Boleyn, Robert S. Stubbs, II, Don A. Langham, John C. Walden, John W. Dunsmore, Jr., Asst. Attys. Gen., Atlanta, Ga., for respondent-appellee in No. 80–7476.

Millard C. Farmer, Joseph M. Nursey, Andrea I. Young, Frank Derrickson, Ralph Goldberg, Thomas McKee West, Atlanta, Ga., for petitioner-appellant in all cases.

Arthur K. Bolton, Atty. Gen., Harrison Kohler, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee in all cases.

Before MORGAN, ANDERSON and THOMAS A. CLARK, Circuit Judges.

R. LANIER ANDERSON, Circuit Judge:

Appellant Jack Howard Potts was sentenced to be executed pursuant to two convictions: one for kidnapping with bodily injury and the other for first degree murder. He brings this appeal of four consolidated petitions for habeas corpus, claiming he has been improperly denied federal review on the merits of his claims. The unusual factual circumstances surrounding Potts' filing of these petitions requires this panel to examine important questions concerning abuse of the writ of habeas corpus. Because we find that the district court should have granted a hearing on the issue of abuse, and because we find that in cases numbered 80–7476 and 80–7477 the district court applied an improper standard, we vacate the decisions in those cases and remand for further hearings. With respect to cases numbered 80–7664 and 80–7665, we affirm the district court's order dismissing, at Potts' request, the petitions filed in those cases.

## FACTS

Because of the difficult question we must address here concerning abuse of the writ, a full statement of the unusual procedural history in these cases is necessary.

Potts' federal habeas petitions attack both convictions and sentences. Both convictions arose out of a single incident in which Potts allegedly kidnapped Michael D. Priest in Cobb County, Georgia, drove Priest to Forsyth County, Georgia, where Potts allegedly shot and killed Priest.

On March 11, 1976, Potts was convicted of kidnapping with bodily injury and armed robbery in the Superior Court of Cobb County, Georgia, and death sentences were imposed for each of those offenses. Four months later, on July 14, 1976, Potts was convicted for the murder of Priest in the Superior Court of Forsyth County, Georgia, and was sentenced to death pursuant to this conviction.

The two cases were consolidated for direct appeal to the Supreme Court of Georgia. On March 16, 1978, that court affirmed Potts' convictions and sentences with respect to the charge of kidnapping with bodily injury and murder, and reversed the sentence of death for armed robbery. *Potts v. State*, 241 Ga. 67, 243 S.E.2d 510 (1978).

Potts, in his brief to this court, alleges that after losing his direct appeal to the Supreme Court of Georgia, he desired to file a petition for writ of certiorari in the United States Supreme Court, but that his attorneys failed to do so.

On November 14, 1978, Potts filed a state habeas corpus petition in the Superior Court of Tattnall County, Georgia, for both of his convictions and death sentences. After consolidated evidentiary hearings on January 22 and April 27, 1979, the superior court entered an order on July 24, 1979, denying Potts all relief. On August 9, 1979, Potts applied for a certificate of probable cause to appeal this denial of state habeas to the Supreme Court of Georgia.

Before any action was taken on his appeal of the denial of state habeas, Potts discharged his attorneys and requested them to withdraw the application pending in the Supreme Court of Georgia. Potts has testified in a hearing on June 10, 1980, related to his first federal habeas petitions, that shortly before asking that his application be withdrawn, his attorneys told him there was no hope of success, but they could only prolong his case and hope that the death penalty would be abolished before completion of his appeals[1] (Tr., June 10,

---

1. We mention this fact for what light it may shed on Potts' subsequent actions with respect to his pursuit of collateral relief. Potts also testified, inconsistently, that his decision to

1980, hearing, p. 20). Counsel communicated Potts' request to withdraw his application to the Supreme Court of Georgia. Potts himself wrote three letters to the Supreme Court of Georgia in November and December, 1979, and in January, 1980, reiterating his request that his applications be withdrawn. On January 8, 1980, the Supreme Court of Georgia denied Potts' motion to withdraw his appeal, denied his application for certificate of probable cause for habeas corpus appeal, and granted the motion to discharge Potts' attorneys.[2]

An execution date was then set in both cases for February 15, 1980. On February 13, 1980, Governor George Busbee, acting upon a request from the Pardon and Parole Board, granted a 90-day stay pending clemency consideration. Potts did not initiate or seek this review by the Pardon and Parole Board. In his brief to this court, Potts alleges without contradiction from the state that he declined to cooperate with attorneys seeking to pursue clemency with the Pardon and Parole Board on his behalf. After a proceeding on April 24, 1980, at which Potts was unrepresented, clemency was denied on May 1, 1980. An execution date was then reset in both cases for June 5, 1980.

On June 3, 1980, the Reverend Murphy Davis and other individuals, in an attempt to stay Potts' imminent execution, filed two "next friend" habeas corpus petitions in both cases in the United States District Court for the Northern District of Georgia. Potts in no way participated or consented to the filing of these petitions. After a hearing on June 4, 1980, in which testimony by a psychologist was taken, documentary evidence was viewed, and a video tape of a press conference held by Potts on June 2, 1980, was reviewed, the district judge dismissed the action, finding that the petitioners were not proper next friends and that Potts was competent.[3] At approximately 6:50 P.M. on June 4, this court entered an order denying the next friends' applications for a stay of execution pending appeal. *Davis v. Austin*, Nos. 80–7418 and 80–7419 (5th Cir. June 4, 1980).

At approximately 7:15 P.M. on that same day, June 4, the judge received notice by telephone that Potts had signed an authorization for Messrs. Millard Farmer, Andrea Young, and Joe Nursey to act as his attorneys and to file for the first time with his authorization two § 2254 petitions attacking his two convictions and sentences.[4] When this telephonic notice was received, Potts' scheduled execution was less than 15 hours away. The judge immediately granted stays of the execution. The state did not contest these stays.

Potts' intention to pursue federal habeas was apparently short-lived. Late in the afternoon on June 6, 1980, the district court received a letter written earlier that day by Potts, in the presence of his mother, in which he asked that his habeas petitions be withdrawn.[5] The letter, not surprisingly, is

---

withdraw his application for a certificate of probable cause was made before being told of the supposed hopelessness of his case by his attorneys. (Tr., June 10, 1980, hearing, p. 20).

2. There is no claim by the state that Potts has failed to exhaust state remedies with respect to the issues raised in his habeas petitions now on appeal. Nor is there any claim that Potts has attempted to deliberately by-pass any state review procedure, either on direct appeal or on collateral attack.

3. Judge O'Kelley entered this order sometime in the afternoon of June 4, 1980, although the record is unclear as to exactly when.

4. These two petitions are numbers 80-7664 and 80-7665 on appeal to this court.

5. The letter, with Potts' grammatical errors, reads as follows:

Dear Judge O Kelly

Sir i wrote a note to you requesting to appeal and you granted a stay. at the time i asked for the new appeals i was with my brother, the only reason i asked for the appeal was to satisfy my brother who i love very much. Judge, i had no idea the stay would be granted, i knew you had refused a last final appeal, so i truly thought that by writing the note in my brothers presence the only thing it would accomplish would be to set his mind at ease so he (my brother) could know without a doubt he had done all he could do for me. Judge O Kelly i am asking you to let me (if its my right) withdraw the appeal. I realize Millard Farmer will only continue to use me and my situation if you fail to help me now. I beg of you to please let me withdraw the appeal as quickly a possible!

emotional, yet articulately phrased. In it, Potts stated that the only reason he authorized the filing of the § 2254 petitions was to set his brother's mind at ease so that his brother could believe that he had done all he could for Potts. Potts further stated that at the time he authorized the filing of his § 2254 petitions, he did not believe that a stay would be granted since he knew of the court's prior refusal of a "last final appeal."[6] Potts requested that his petition be withdrawn as quickly as possible so that he could die while "in a state of grace." Potts further requested that he be allowed to dismiss his attorneys and that the court order that he be permitted to refuse to see reporters or news people. Potts assured the court that he was of sound mind and body. At the end of the letter on a third page were five items, some of which were requests. Potts specifically asked that an immediate date for execution be set.

During the weekend after June 6, Potts' attorneys attempted to convince Potts to continue with his habeas corpus action and their representation of him. Because the district court refused to dismiss Potts' petition on the basis of the letter transmitted by Potts' mother, the district court met on June 9 with Potts' attorneys and representatives of the Georgia Attorney General's office to establish a procedure to determine whether or not Potts' petitions would be withdrawn. The district court proposed that Potts be brought to the court in order that the court could address him personally and suggested that the court follow a procedure analogous to acceptance of a plea of guilty under Rule 11 of the Federal Rules of Criminal Procedure. All counsel concurred in the court's proposed approach. The court further proposed that a court-appointed psychiatrist be present at the hearing for the purpose of rendering his opinion as to Potts' competency at the time of the hearing. Counsel also agreed with this procedure. Because Potts had expressed in his letter to the court that he would thereafter refuse the help of his counsel and desired not to talk with them further, Potts' attorneys agreed that they should not act as counsel at the hearing but that the court should conduct the proceedings.

On June 10, 1980, a hearing was held with Potts present and his attorneys also in the courtroom. The district court commenced the hearing by advising Potts that his attorneys of record had not been relieved by the court and that he had a right to be represented at the hearing by counsel of record or another attorney. Potts indicated that he did not desire his attorneys of record or any other attorney to represent him. Potts then took the witness stand and was sworn in. Potts was warned by the court that he had a right to refuse to answer any question that would be incriminating. The court thereupon proceeded to question Potts concerning his request to withdraw his ha-

---

Let me get a date set immediately and most of all let me die while in a state of grace! And could you issue an order that i refuse to see any reporters or news people. Judge O Kelly i am giving this letter to my mother who will forward it to you today 6/6/80. I assure you Judge i am sound of mind and body, but i must be able to withdraw the appeal and i do now, as of today refuse the help of Millard Farmer and Andrea Young. and i refuse to speak with them. God Bless you Judge for your kind and considerate cooperation.

/s/Jack H. Potts
69124—4th Floor
Reidsville, GA.
6/6/80

June 6, 1980
Witnessed:
/s/Mrs. Carolyn Potts (Mother) June 6, 1980. Attached to the letter was a third page, reading as follows:

(1) No reporters to be let in to Reidsville [the prison in which Potts was incarcerated] to see me.
(2) No moving me back and forth from Reidsville Prison to Jackson Prison.
(3) An immediate date to be set so the circus atmosphere will not have the chance to begin.
(4) Please accept my apology for having caused you problems in this, Judge.
(5) Every thing is prepared here at Reidsville for an execution if an immediate date is set.

/s/Jack H. Potts
6/6/80

6. The letter does not state which appeal this was, but presumably Potts is referring to the "next friend" petition rejected by the district court on June 4, as this is the only federal petition filed with respect to Potts' case before he authorized the first set of petitions.

beas corpus petitions. After establishing that Potts had written the letter the court received on June 6, the court asked Potts why he wished to withdraw his petitions. Potts replied,

I was tried by a jury of twelve men and women. I have been found guilty of murder, a murder I committed. I could argue the Constitutional laws that may have been overlooked or misused or whatever but I see no sense in going on further and further, year after year, and probably end up dying in the electric chair anyway.

I did not want to change my mind this past Thursday but, as a I said in the letter, it's, it would have been very hard on my brother to see me die and thinking he could have done something else for me so now that he can leave it that, you know, he did what he could do and now he will be satisfied. I hope he can live with that.

(Tr., June 10, 1980, hearing, pp. 10–11).

The court thereupon questioned Potts as to whether he had been threatened or coerced to withdraw his petitions.

Q Has anyone in any way threatened you to get you to withdraw—

A Definitely not.

Q —this appeal?

A No, sir, Judge.

Q Has anyone tried to coerce you into changing your mind?

A No one has said anything about would you do it or would you not do this. I have had people ask me would you not do it but no one has coerced me into doing this. I made this decision on my own.

Q Has anyone at all tried to get you to in any way withdraw your habeas corpus actions?

A No, no one has done that. This is my decision.

Q Has any force been used against you to get you to change or in any way make your life such that it would be more miserable for you if you didn't change your mind?

A Your Honor, when I asked, requested for this appeal, I knew that I, there would be some things that I would go through that any man would in prison because of just human feelings. Some people wanted me dead. Some wanted me alive but I made this decision and I'm asking the Court—and I did not do anything to make a mockery of the judicial system. I did it on the grounds like I told you in the letter. That's the only reason I did it. That's the only reason I asked for the appeal.

(Tr., June 10, 1980, hearing, pp. 12–13).

The court then questioned Potts as to the appeals he had previously brought with respect to his convictions and sentences. Potts was knowledgeable of the course of his case through the state courts.[7] He testified that he had read the § 2254 petitions filed in federal court, but was somewhat confused as to whether they raised the same claims presented in the state courts.

The court then questioned Potts to ascertain whether he understood the significance of dismissing his federal habeas petitions.

Q The action you are requesting, do you realize would be an abandonment of certain Constitutional, claims of certain Constitutional violations? Do you understand that?

A Yes, sir.

Q And do you understand that, as I mentioned earlier, there is the direct appeal, there is the opportunity to make a State habeas corpus, a State habeas corpus attack, collateral at-

---

**7.** Potts expressed his belief that a petition for writ of certiorari had been filed with the United States Supreme Court on his direct appeal. Lawyers present at the hearing informed the district court this was not true. When the district court informed Potts of a possible error in his memory of the course of his direct appeal, Potts stated it did not matter to him whether or not certiorari had been carried to the U. S. Supreme Court. (Tr., June 10, 1980, hearing, pp. 36–37).

tack upon a conviction and once that has been exhausted, one may then through the Federal courts file habeas corpus, making claims of Constitutional violations that have already been made before the State court and you can only make them in Federal court if you have exhausted State court remedies? Do you understand that?

A Yes.

Q Now, it appears that you previously have taken your direct appeal through the Georgia Supreme Court to the U. S. Supreme Court and that you had your State habeas corpus to the Tattnall Superior Court and to the Georgia Supreme Court.

A (Nods head affirmatively.)

Q And that the third and last of those forms of attack you now are in; that is, in the United States District Court claiming certain Constitutional violations. Do you understand that?

A Yes.

Q Do you understand that if you dismiss or abandon this, you have abandoned your last available attack upon your conviction and sentence?

A I'm well aware of that.

.     .     .     .     .

Q Do you have any question of the Court concerning this matter or the effect of your withdrawal or abandonment of this action?

A No.

.     .     .     .     .

Q And you want both these habeas corpus cases dismissed?

A Yes, sir.

Q You realize if I dismiss those, then you have nothing from which to appeal to the Court of Appeals for the Fifth Circuit or to the United States Supreme Court?

A Yes, sir.

Q Do you realize the consequences of that would be that you would be remanded to the State prison for resentencing by the two superior courts involved?

A Yes, sir.

(Tr., June 10, 1980, hearing, pp. 22–25).

The court thereupon gave the attorneys for the state and Potts' attorneys an opportunity to say anything or to request the court to ask any question of Potts. At that time they made no requests for additional questions to be posed to Potts.

After Potts had finished testifying, the court placed on the stand a psychiatrist, Dr. Davis, who had been in the courtroom observing Potts during the hearing. Dr. Davis testified he had no previous contact with Potts but that, based on his observation during the hearing, Potts understood the nature of his request and the consequences of it. Dr. Davis stated he could observe nothing which would cause the court concern about Potts' competence.

A short recess was taken after the testimony of Dr. Davis, at which time Potts' attorneys requested the court to question Potts concerning destruction of certain personal effects in prison about which they had heard. When the hearing reconvened, the court questioned Potts concerning this matter.

Q Mr. Potts, I am not going to call you back to the stand but I do want to make sure I understand one other thing that has been suggested by the attorneys and while I do not have full knowledge of everything that has been reported by the media, apparently there has been reports in the media of some destruction of religious objects of yours and some other treatment of you at Reidsville and that this had a bearing upon and was the reason you wrote the letter you wrote and are changing your mind. Is that correct, sir?

A The reason I changed my mind, Your Honor, was the reason I told you in that letter.

Whatever else happened, which some things did happen and I wish that you could help make sure they don't happen anymore these last few days but that's

not the reason I changed my mind. My letter is the reason I changed my mind, I told you in the letter.

Q Have you told Ms. Nicholson or other persons that the reason you were doing this was because of acts taken against you by the guards or prison officials?

A No, I did not say that's the reason. (Tr., June 10, 1980, hearing, pp. 35–36).[8]

On June 13, 1980, the district court entered an order dismissing Potts' petitions. When this order was entered, the state had not filed any responsive pleadings and the order in no way addressed the merits of Potts' claims. The court found that Potts was fully competent to make the decision to abandon further legal proceedings and further found that his requests were clear and were not the product of mental incompetency or coercion. The court directed that Potts' attorneys be stricken as counsel of record and dissolved the stay of execution. With the stay dissolved, Potts' execution was rescheduled for July 1, 1980.

On June 25, 1980, the district court received a telephone call from Mr. Joe Nursey, who was counsel of record in the previously dismissed petitions, indicating that Potts had authorized the filing of a second set of petitions for writs of habeas corpus. Since only a few days remained before the scheduled execution, the court requested that Mr. Nursey deliver the pleadings to Gainesville, Georgia, where the court was holding a civil trial. Upon arriving, Mr. Nursey indicated that he had unintentionally misled the court and that he was not authorized to file the actions until the following morning so that Potts could contact a family member prior to that time. After the court indicated to Mr. Nursey that trifling with the court would not be countenanced, Mr. Nursey proceeded to file the actions at that time. The two petitions filed on June 25 are essentially identical to the first two petitions.[9] The petitions filed on June 25 contain additional material relating to the events surrounding the filing of his first set of habeas petitions and his quick withdrawal of those petitions. The June 25 petitions alleged that the reason Potts withdrew his prior petitions was depression he suffered resulting from "exceptional harassment by prison officers," discontent of family members at the prospect of his continued incarceration,[9a] and the "circus atmosphere" surrounding his case. The substantive issues raised in the second set of petitions are verbatim identical with those raised in the first set of petitions. Potts raises several serious allegations of constitutional impropriety with respect to both his convictions and sentence.[10]

8. This panel commends Judge O'Kelley's decision to use a procedure analogous to Fed.R. Crim.P. 11 for accepting a guilty plea to determine whether Potts genuinely desired to withdraw his habeas petitions. His action reflects a compassionate, humane concern to ascertain Potts' true intentions with respect to his first habeas petitions. His questioning of Potts was thorough.

9. The petitions filed on June 25 are numbers 80 7476 and 80–7477 on appeal to this court.

9a. In his brief to this court, Potts alleges that his mother was displeased with his decision to appeal and told him he had done the wrong thing by not going through with the execution.

10. With respect to his conviction in Cobb County for kidnapping with bodily injury, armed robbery, and aggravated assault, Potts claims (i) faulty jury instructions, contributing to conviction of a capital crime and constituting deprivation of due process, (ii) state's knowing refusal to correct witness's testimony which would otherwise impeach the witness, (iii) improper admission of hearsay evidence of prior crimes, (iv) improper closing argument, (v) failure to change venue for prejudicial pretrial publicity, (vi) cruel and unusual punishment in imposing death penalty for kidnapping, (vii) improper removal of veniremen with scruples concerning capital punishment, (viii) denial of due process by failure to state aggravating circumstances within indictment, (ix) arbitrary and capricious application of Georgia's death penalty, (x) no theoretical justification for death penalty, (xi) excessiveness of sentence considering all circumstances surrounding crime, (xii) inadequacy of appellate review in Georgia of capital cases, and (xiii) cruel and unusual means of execution in Georgia.

With respect to his conviction for murder in Forsyth County, Potts makes essentially the same claims as numbers (vii), (viii), and (ix)–(xiii) of the petition relating to the Cobb County conviction, plus claims of double jeopardy, possible reliance on improper aggravating circumstances by the jury, sufficient evidence to

With the filing of the second set of petitions, the court scheduled a hearing for the next day, June 26, to determine whether the subsequent petitions should be entertained and a stay granted. Because of confusion as to whether Potts had authorized this second set of petitions, the court and counsel for both sides called the warden of the Georgia Diagnostic and Classification Center where Potts was being held to determine if Potts had authorized the filing of the petitions. The warden, after talking with Potts, indicated to the court and counsel that Potts had denied authorizing the petitions. Faced with Potts' conflicting actions, the court directed Potts to be present at the June 26 hearing.

At the June 26 hearing, the court informed Potts that the only reason he was present was to ascertain whether he had indeed filed a second set of petitions and whether he wished to be represented by an attorney. Potts indicated that he wished to talk with a lawyer before he indicated whether he did authorize the filing of the second set of petitions, but that he did not wish to confer with Mr. Nursey. Potts indicated he wished to be represented by a Mr. Goldberg and a Mr. West. After conferring with Goldberg and West, Potts indicated that he desired they represent him in the proceeding and that he did authorize the filing of the second set of habeas corpus petitions. Mr. Goldberg and West subsequently indicated that Potts also wished Mr. Nursey to represent him. The court thereafter did not question Potts although he was present throughout the hearing, but instead, received legal arguments on whether there had been an abuse of the writ of habeas corpus and whether the dismissal of the prior petitions had been with or without prejudice.

Although the district court indicated the hearing would be devoted solely to legal questions, Potts' attorneys made clear they were prepared to present evidence which would explain why Potts was filing a second set of petitions and which would demonstrate the involuntariness of his withdrawal of his first set of petitions. Potts' attorneys alleged that Potts was filing his second set of petitions because he had indeed changed his mind. In an offer of proof, based on the brief interview with Potts at the initiation of the hearing, Potts' attorneys offered to place Potts on the stand to explain why he was filing his second set of petitions. Potts' attorneys further stated that Potts was prepared to testify that the reason he gave up his earlier appeals was that he was afraid of the consequences and retaliation that he would suffer from prison authorities by reason of his pursuing his habeas petitions. Also, he would testify that he was afraid to continue to live under the conditions that he saw as being brutal, cruel and unusual, including his medical treatment.[11] They alleged Potts had reached a state of mental fatigue after filing his first set of petitions because of conditions at the institution where he was kept. They also alleged that when Potts filed his first set of federal habeas petitions, he was harassed by prison authorities, but when he withdrew the first petition, his treatment improved considerably. They further alleged that conditions under which Potts had been incarcerated for the past five years precluded anyone from making a valid waiver of a constitutional right. Potts' attorneys had present at the hearing experts who would testify as to Potts' mental state at the time he withdrew his first petitions and on his mental condition with respect to any issue of waiver or bypass or deliberate successive petitions. Potts' attorneys stated they were not alleging that Potts was not competent, but were alleging that there were "other pressures put on Mr. Potts and everyone else on death row that make them make decisions that are sometimes contradictory." Despite offering to place this evidence in the record at the

---

establish insanity defense, and failure of the district court to instruct on mitigating circumstances.

11. In his brief to this court, Potts alleges inadequate medical treatment for a bullet wound received when he was captured, as well as constant pain from the wound.

hearing, the court refused to take any testimony.[12]

In an order dated June 26, 1980, the district court refused to stay Potts' execution and dismissed his second set of habeas petitions. The court held that abandonment at the federal habeas level, by itself, is sufficient to render any subsequent petition an abuse of the writ. The court prefaced its June 26 order by describing the June 10, hearing:

Because of the potential finality of Mr. Potts' requests [to dismiss his first petitions] and to ensure that Mr. Potts' decision to abandon further legal action was made knowingly and intelligently, the court conducted a hearing on June 10, 1980, to determine if Mr. Potts had made a competent decision to abandon his right to federal habeas corpus review.

The court continued, quoting from *Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963):

[A] waiver may also be present

if ... the prisoner deliberately abandons one of his grounds at the first hearing. Nothing in the traditions of habeas corpus review requires the federal courts to tolerate needless piecemeal litigation, or to entertain collateral proceedings whose only purpose is to vex, harass, or delay.

*Id.* at 18, 83 S.Ct. at 1078.

The continued vitality of *Sanders* is demonstrated by the recent decision in *Paprskar v. Estelle*, 612 F.2d 1003 (5th Cir. 1980) [*cert. denied* —— U.S. ——, 101 S.Ct. 239, 66 L.Ed.2d 111 (1980)]. Although the court determined that no abuse of the writ was presented by that case, it reaffirmed the requirement that where there has been " 'an intentional relinquishment or abandonment of a known right or privilege,' " which a petitioner subsequently attempts to raise, an abuse of the writ is present. *Id.* at 1006, quoting *Fay v. Noia*, 372 U.S. 391, 439 [83 S.Ct. 822, 849, 9 L.Ed.2d 837] (1963).

From the evidence presented in the 'next friend' actions brought on Mr. Potts' behalf and in the proceedings concerning Mr. Potts' prior petitions, the court is compelled to find that there was an intentional, knowing, and unequivocal relinquishment of a known right which constituted a waiver of federal habeas corpus review .... That there was a waiver and an abandonment is established beyond a cavil.

The court further stated,

If ever there is a situation where a finding of an intentional abandonment of a known right is demanded, this case presents it. By the same token, seeking another stay and consideration of substantively identical petitions constitutes an abuse of the writ as defined by *Sanders v. United States*, [373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963)]. Having brought Mr. Potts before the court on those petitions for no purpose other than to determine whether or not he desired federal habeas corpus review, and having determined that he wished to abandon that right, the court determined that the matter was final .... Mr. Potts' decision was not simply a voluntary dismissal without prejudice; it was a final abandonment of a known right to federal review of his state convictions and sentences of death.

The district court made no findings as to the motive or reasons behind Potts' actions. Although noting that there is no present requirement that a habeas corpus petitioner make even a colorable claim of innocence, the district judge cited Potts' admission of guilt as a cumulative reason supporting the finding of abuse of the writ.

This court thereafter granted stays of execution on June 28, 1980, with respect to Potts' second set of petitions (numbers 80–7476 and 80–7477) and directed an expedited appeal. On July 1, 1980, the Supreme

---

**12.** The state did not deny these factual allegations but has had no opportunity to do so. Thus, the record with respect to the second set of petitions contains allegations of factual matters going to the issue of abuse and to the voluntariness of Potts' withdrawal of his first set of petitions with no substantive evidence tending to confirm or deny these allegations.

Court of the United States rejected the state's application to vacate the stays in *Zant v. Potts*, —— U.S. ——, 100 S.Ct. 3052, 65 L.Ed.2d 1138 (1980).

On July 7, 1980, Potts' attorneys took the unusual step of filing a notice of appeal with respect to the first set of habeas petitions (numbers 80–7664 and 80–7665). The district court denied Potts a certificate of probable cause with respect to these petitions, finding that no useful purpose would be served by allowing an appeal in those cases since, if Potts were successful in his appeal on the second set of petitions, the same issues would then be before the court for consideration on the merits. Potts then applied to this court for a certificate of probable cause to appeal and filed a motion for leave to proceed on appeal in forma pauperis. Potts explained that a certificate of probable cause with respect to the first set of habeas petitions was requested only as a precautionary measure. Potts' counsel explained that should a court find the dismissal in the first set of petitions to be something other than a voluntary dismissal pursuant to Rule 41(a) of the Federal Rules of Civil Procedure, an appeal with respect to these petitions would be necessary. This court granted Potts' application for a certificate of probable cause and for leave to appeal in forma pauperis and ordered those appeals to be consolidated and expedited with the appeals in numbers 80–7476 and 80–7477.

## ANALYSIS OF FACTS AND QUESTION PRESENTED

Although Potts has in the course of these cases filed a total of four habeas corpus petitions, we consider for purposes of applying the abuse doctrine, as did the district court, that this case is equivalent to the more typical situation where a second petition is filed which makes the same claims as an earlier petition.[13] Two petitions were filed on June 4, one for the conviction in Cobb County and one for the conviction in Forsyth County, Georgia. They were consolidated. Similarly, the two petitions filed on June 26—each relating to one conviction—were consolidated. For convenience, we will often describe the first two petitions filed on June 4, as his first habeas petition, and the last two petitions filed on June 26, as his second habeas petition.

As we read the district court's order, the court there found an abuse of the writ with respect to the second petition on the sole ground that Potts had abandoned all rights to future federal habeas when he dismissed his first petition.[14] Potts' request for an evidentiary hearing to rebut the allegation of abuse was refused. The court made no finding with respect to why Potts brought and then dismissed his first petition or why he was filing his second petition. Nor did the district court make findings as to Potts' motives with respect to the two sets of petitions or with respect to any bad faith or purpose to vex or harass the court or to

**13.** Both the state and the district court made clear at the June 26 hearing, and we agree, Potts cannot be held responsible for the "next friends" petition filed in his behalf as far as determining the number of petitions he has filed.

**14.** Arguably, the district court gave two other grounds for finding an abuse. At one point, the district court noted, "By the same token, seeking another stay and consideration of substantively identical petitions constitutes an abuse of the writ . . . ." Insofar as the district court indicated by this that the filing of a second petition raising the identical grounds is *per se* an abuse of the writ, the court was mistaken.

This Court has consistently interpreted the habeas corpus statutes as imposing no numerical limits on a state prisoner's access to

the federal courts . . . . Instead, we have held that summary consideration of a petition is the appropriate remedy when an applicant seeks to relitigate a claim . . . . [T]o equate the filing of successive petitions with an 'abuse' of habeas is to misunderstand the extraordinary nature of the writ.

*Hardwick v. Doolittle,* 558 F.2d 292, 296 (5th Cir. 1977), *cert. denied* 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978) (citations omitted).

Another ground arguably relied upon by the district court for finding an abuse was Potts' admission of guilt. Because the court cited this ground as being only cumulative of the abandonment ground, and because the state has not asserted this ground on appeal, we decline to consider it. *See Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979).

delay his execution by piecemeal litigation. Nor did the court address any equitable considerations or make any findings as to whether the ends of justice would be served by addressing Potts' second petition. The only factual finding by the court was that Potts' alleged abandonment on June 10 was knowing and voluntary. It deemed no other findings necessary to find an abuse with respect to the second, identical petition.

On appeal, Potts raises three substantive issues we must address. First, whether Fed.R.Civ.P. 41(a) was applicable to Potts' dismissal of his first petition so as to give him a right to dismiss his first petition without any procedural prejudice attaching to his claims. Second, whether an intentional and knowing waiver and abandonment of all rights to future federal habeas, made at the federal habeas level before any evidentiary hearing or response from the state, is alone sufficient to find an abuse with respect to a subsequent federal habeas petition raising the same issues. Third, whether the district court erred in denying Potts an evidentiary hearing after he filed his second habeas on the questions as to why he filed and dismissed his first petitions and whether his alleged intentional and knowing abandonment on June 10 was voluntary. We first discuss briefly the historical background of the abuse of the writ doctrine before discussing the issues.

## LEGAL BACKGROUND

■ The doctrine of abuse of the writ has developed as a result of the familiar rule of law that a denial of an application for habeas corpus is not *res judicata* with respect to subsequent applications. *Sanders v. United States*, 373 U.S. 1, 7, 83 S.Ct. 1068, 1072, 10 L.Ed.2d 148, 156 (1963); *Fay*

v. *Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); *Salinger v. Loisel*, 265 U.S. 224, 230, 44 S.Ct. 519, 521, 68 L.Ed. 989 (1924). The Supreme Court has indicated that the inapplicability of *res judicata* to habeas has roots within our jurisprudential system based upon our concern that neither life nor liberty be deprived unconstitutionally:

Conventional notions of finality of litigation have no place where life or liberty is at stake and infringement of constitutional rights is alleged. If 'government . . . [is] always [to] be accountable to the judiciary for a man's imprisonment,' *Fay v. Noia, supra* (372 U.S. at 402), access to the courts on habeas must not be thus impeded. The inapplicability of res judicata to habeas, then, is inherent in the very role and function of the writ.

*Sanders v. United States*, 373 U.S. at 8, 83 S.Ct. at 1073.

Because of the inapplicability of *res judicata* to habeas corpus, prisoners have in the past frequently filed successive petitions, alleging claims already adequately determined in prior petitions, or alleging different claims which could have been adequately pleaded and adjudicated in prior petitions. In order to curb the opportunity for prisoners to file nuisance or vexatious petitions, and to ease the burden on the courts arising from such petitions, guidelines have evolved as to when a district court, in the exercise of its sound judicial discretion, may decline to entertain on the merits a successive or repetitious petition. These guidelines reflect a concern that in the absence of abuse, a federal habeas court will adjudicate at least once the claims of a petitioner.

At present there are two statutes governing the discretion of a trial court to decline a § 2254 petition by a state prisoner.[15]

15. There are three statutes touching on the discretion of a trial court to decline to address successive or repetitious post-conviction petitions from federal prisoners. 28 U.S.C.A. § 2244(a) (West 1971); 28 U.S.C.A. § 2255 (West 1971); and Rule 9(b) of Rules Governing Section 2255 Proceedings for the United States District Courts, 28 U.S.C.A. foll. § 2255 (West 1980).

These three statutes also reflect a concern that in the absence of abuse, a federal court will adjudicate at least once the claims of federal prisoners seeking post-conviction relief. Section 2244(a) requires that the legality of the detention be "determined" on a prior application before a federal court may refuse to hear a subsequent application for habeas. Rule 9(b) says a federal court need not hear a successive § 2255 petition if a prior petition was deter-

First enacted was 28 U.S.C.A. § 2244(b) (West 1971), which reads:

> When after an evidentiary hearing on the merits of a material factual issue, or after a hearing on the merits of an issue of law, a person in custody pursuant to the judgment of a State court has been denied by a court of the United States or a justice or judge of the United States release from custody or other remedy on an application for a writ of habeas corpus, a subsequent application for a writ of habeas corpus in behalf of such person need not be entertained by a court of the United States or a justice or judge of the United States unless the application alleges and is predicated on a factual or other ground not adjudicated on the hearing of the earlier application for the writ, and unless the court, justice, or judge is satisfied that the applicant has not on the earlier application deliberately withheld the newly asserted ground or otherwise abused the writ.

The legislative history indicates that this statute was enacted to introduce a qualified application of the doctrine of *res judicata* to habeas corpus and arose out of a concern for the rapidly increasing number of meritless habeas petitions from state prisoners. S.Rep.No.1797, 89th Cong., 2d Sess., *reprinted in* [1966] U.S.Code Cong. & Adm.News 3663. By its terms, it provides no authority to dismiss the instant petitions, since it authorizes a district court not to entertain a subsequent application only if there has been an "evidentiary hearing on the merits of a material factual issue, or after a hearing on the merits of an issue of law." Here, the trial court has held no hearings with respect to the factual or legal claims alleged in Potts' petitions, nor has it relied on any findings by state courts in addressing factual or legal claims as it is authoriz-

ed to do in certain circumstances by 28 U.S.C.A. § 2254(d) (West 1977).

The second statute applicable to a successive or repetitious petition is Rule 9(b) of Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C.A. foll. § 2254 (West 1977):

> Successive petitions. A second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ.

By its language, Rule 9(b) also does not apply since Potts' second set of petitions failed to allege new or different grounds from his first petitions, and there was no determination on the merits of the first petitions.[16]

Although we have noted that the two statutes respecting successive petitions by state prisoners are not literally applicable to the instant case, we are not left without guidance since Rule 9(b) makes clear that it incorporates and preserves existing case law with respect to abuse of the writ. More specifically, as enacted by Congress, Rule 9(b) codifies the seminal case of *Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963) with its guidelines concerning abuse of the writ. *Advisory Committee Note*, Rule 9, Rules Governing Section 2254 Cases in the United States District Courts (28 U.S.C.A. foll. § 2254); H.R.Rep.No.1471, 94th Cong., 2d Sess., 5–6, *reprinted in* [1976] U.S.Code Cong. & Adm. News, pp. 2478, 2482; *Paprskar v. Estelle*, 612 F.2d 1003 (5th Cir.), *cert. denied* —— U.S. ——, 101 S.Ct. 239, 66 L.Ed.2d 111

---

mined "on the merits" or there is abuse with respect to a new claim raised. Section 2255 has the broadest language, stating that a successive § 2255 petition need not be heard if it asks for "similar relief." However, *Sanders* makes clear that a § 2255 petition is to be as readily available as an application for habeas and establishes guidelines for determining the

discretion of federal courts to decline to hear successive § 2255 petitions. We discuss those guidelines more fully below.

**16.** We discuss more fully below at p. 744 why we conclude there has been no determination on the merits of Potts' claims.

(1980); *Galtieri v. Wainwright,* 582 F.2d 348, 356 n.18 (5th Cir. 1978) (en banc).[17]

In *Sanders v. United States,* the Supreme Court addressed the question: in light of the inapplicability of *res judicata* to habeas corpus, what significance, in determining whether to entertain a subsequent petition, should a district court give to the denial of prior applications for habeas relief. Although *Sanders* was concerned with a § 2255 motion, the Court made clear that the principles it was there announcing concerning successive petitions applied generally to applications for federal habeas. 373 U.S. at 15, 83 S.Ct. at 1077. *See also Advisory Committee Notes,* Rule 9(b) of the Rules Governing Section 2254 Cases in United States District Courts (28 U.S.C.A. foll. § 2254); *Paprskar v. Estelle, supra.*

*Sanders* divided successive applications for habeas into two situations. The first classification specified the principles governing successive motions on grounds previously heard and determined:

Controlling weight may be given to denial of a prior application for federal habeas corpus or § 2255 relief only if (1) the same ground presented in the subsequent application was determined adversely to the applicant to the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application.

*Sanders v. United States,* 373 U.S. at 15, 83 S.Ct. at 1077. Here, the notion of abuse of the writ does not arise. Instead, the court, in deciding whether to address a subsequent petition, ascertains whether there has been a determination on the merits and whether the ends of justice would be served by a redetermination on the merits. The criterion of the ends of justice typically involves looking at objective factors, such as whether there was a full and fair hearing with respect to the first petition, and whether there has been an intervening change in the law. 373 U.S. at 16–17, 83 S.Ct. at 1077–78.

However, the Supreme Court was careful not to foreclose other factors which might be relevant in a determination of the ends of justice. *Ibid.*

■ The second classification dealt with successive applications presenting different grounds from those presented in a prior application and with successive applications containing the same ground earlier presented but not adjudicated on the merits. It is with respect to this second classification that the notion of abuse of the writ is applicable. The Supreme Court stated that a district court can avoid full consideration of the merits with respect to the second type of application only if there has been an abuse of the writ. In discussing what constitutes an abuse of the writ, the Supreme Court stated:

To say that it is open to the respondent to show that a second or successive application is abusive is simply to recognize that 'habeas corpus has traditionally been regarded as governed by equitable principles. *United States ex rel. Smith v. Baldi,* 344 U.S. 561, 573 [73 S.Ct. 391, 397, 97 L.Ed. 549] (dissenting opinion). Among them is the principle that a suitor's conduct in relation to the matter at hand may disentitle him to the relief he seeks. Narrowly circumscribed, in conformity to the historical role of the writ of habeas corpus as an effective and imperative remedy for detentions contrary to fundamental law, the principle is unexceptionable.' *Fay v. Noia, supra* (372 U.S. at 438 [83 S.Ct. at 848]). Thus, for example, if a prisoner deliberately withholds one of two grounds for federal collateral relief at the time of filing his first application, in the hope of being granted two hearings rather than one or for some other such reason, he may be deemed to have waived his right to a hearing on a second application presenting the withheld ground. The same may be true if, as in *Wong Doo* [*v. United States,* 265 U.S. 239, 44 S.Ct. 524, 68 L.Ed. 999] the prison-

---

17. It has been noted that § 2244(b) also has been interpreted as a codification of *Sanders.*

*Paprskar v. Estelle,* 612 F.2d at 1006, n.11.

er deliberately abandons one of his grounds at the first hearing. Nothing in the traditions of habeas corpus requires the federal courts to tolerate needless piecemeal litigation, or to entertain collateral proceedings whose only purpose is to vex, harass, or delay.

*Sanders v. United States,* 373 U.S. at 17–18, 83 S.Ct. at 1078–79.

*Sanders* also incorporated within the guidelines defining the nature of abuse of the writ the principles enunciated in *Fay v. Noia,* 372 U.S. at 438–440, 83 S.Ct. at 848–849, and *Townsend v. Sain,* 372 U.S. 293 at 317, 83 S.Ct. 745 at 759, 9 L.Ed.2d 770. *Sanders v. United States,* 373 U.S. at 18, 83 S.Ct. at 1078. The section of *Fay v. Noia* referred to by the *Sanders* Court announces the familiar rule that district judges may deny relief to an applicant who has deliberately bypassed the orderly procedure of state courts. The Court stated that the definition of waiver enunciated in *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461—*i. e.,* the intentional relinquishment or abandonment of a known right or privilege—was one necessary element *inter alia* in finding a deliberate bypass. *Fay v. Noia,* 372 U.S. at 438–39, 83 S.Ct. at 848–49. The principle found in the section of *Townsend v. Sain* referred to by the *Sanders* Court states that if "for any reason not attributable to the inexcusable neglect" of a state petitioner, evidence crucial to adequate determination of the constitutional claim was not developed in state court, a hearing in federal court is compelled. *Townsend v. Sain,* 372 U.S. at 317, 83 S.Ct. at 1078.

Several broad principles in addition to those enunciated in *Sanders,* arising out of concern that abuse of the writ not become a substitute *res judicata,* have been enunciated in other cases. Within this circuit, we

have concluded, "The 'abuse of the writ' doctrine is of rare and extraordinary application." *Paprskar v. Estelle,* 612 F.2d at 1007; *Hardwick v. Doolittle,* 558 F.2d 292, 296 (5th Cir. 1977), *cert. denied* 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978); *Simpson v. Wainwright,* 488 F.2d 494, 495 (5th Cir. 1973); *see also Galtieri v. Wainwright,* 582 F.2d 348, 368 (5th Cir. 1978) (en banc) (J. Goldberg, dissenting).[18] This circuit, amplifying on *Sanders,* has stated that the equities of the situation and the conduct of the petitioner are relevant to the determination of whether an abuse has occurred. *Paprskar v. Estelle, supra.* If a petitioner is able to present some "justifiable reason" explaining his actions, reasons which "make it fair and just for the trial court to overlook" the allegedly abusive conduct, the trial court should address the successive petition. *Price v. Johnston,* 334 U.S. 266 at 291, 68 S.Ct. 1049 at 1063, 92 L.Ed. 1356; *Paprskar v. Estelle, supra.*

Finally, and significantly, the Supreme Court in *Sanders* stated that no matter into which classification a successive petition fell, a district judge always has the discretion—and sometimes the duty—to reach the merits.

The principles governing both justifications for denial of a hearing on a successive application are addressed to the sound discretion of the federal trial judges. Theirs is the major responsibility for the just and sound administration of the federal collateral remedies, and theirs must be the judgment as to whether a second or successive application shall be denied without consideration of the merits. Even as to such an application, the federal judge clearly has the power—and, if the ends of justice demand, the duty—to reach the merits.

---

**18.** The Supreme Court apparently attempted to *increase the discretion permitted district courts* to refuse to entertain successive petitions when it proposed the Rules Governing Section 2254 Cases. The Supreme Court's version of Rule 9(b) stated that a trial court need not entertain a successive petition alleging a new or different ground if failure to assert that ground in the prior petition was "not excusable." Congress, in enacting these proposed rules, changed the Supreme Court's language to "abuse of the writ" because of concern that the Supreme Court's language would give district courts too broad a discretion to dismiss successive petitions. H.Rep.No.94–1471, 94th Cong., 2d Sess., *reprinted in* [1976] U.S.Code Cong. and Adm. News, 2478.

*Sanders v. United States,* 373 U.S. at 18–19, 83 S.Ct. at 1078–79.

## WHETHER POTTS' ABANDONMENT WAS TANTAMOUNT TO RULE 41(a) DISMISSAL

■ Potts raised a novel argument below, and before this court, that as a matter of law it is inappropriate for the court to apply the abuse of the writ doctrine in the context of this case. He contends that because the state had not filed any responsive pleadings at the time of his withdrawal of his first petitions, he had a right voluntarily to withdraw these petitions without any procedural prejudice whatsoever. He grounds his argument on Rule 11 of the Rules Governing § 2254 Cases (28 U.S.C.A. foll. § 2254) which reads,

> The Federal Rules of Civil Procedure, to the extent that they are inconsistent with these rules, may be applied, when appropriate, to petitions filed under these rules.

as well as upon Rule 41(a) of the Federal Rules of Civil Procedure, providing that a plaintiff may dismiss an action without order of the court and without prejudice by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever occurs first. As with ordinary civil plaintiffs, he maintains that as a habeas petitioner, he has a right to dismiss a habeas petition in these circumstances under Fed.R.Civ.P. 41(a) without any prejudice whatsoever attaching.

If Potts' position were correct, a habeas petitioner on death row could, with no fear of adverse effects, file a first petition immediately before his scheduled execution date and then subsequently dismiss the petition after his scheduled execution date had passed, as did in fact occur here. This action could be part of a conscious strategem to delay the execution. Because we think that such action is relevant evidence as to whether or not there has been an abuse of the writ, we believe that the blind application of Fed.R.Civ.P. 41(a) to the dismissal of a prior application would be inconsistent with the legal principles above set out mandating that the problem of successive applications be governed by the abuse of the writ doctrine.[19] Accordingly, Potts' position in this regard is rejected.

## DOES A KNOWING AND INTENTIONAL WAIVER PER SE CONSTITUTE AN ABUSE OF THE WRIT OF HABEAS CORPUS?

■ The district court held that Potts intentionally abandoned his federal corpus rights and that this rendered his subsequent petition an abuse of the writ. Despite Potts' allegations of reasons justifying his actions, and despite his proffer of evidence, the court did not hold an evidentiary hearing. The narrow and important issue facing us on this appeal is whether or not the knowing and intentional waiver, pursuant to the classic definition enunciated in *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed.2d 1461, of Potts' federal habeas corpus rights renders a subsequent petition an abuse of the writ, without regard to any justifiable reasons Potts may have had for his initial waiver or subsequent petition.[20]

The district court relied on dicta from *Paprskar v. Estelle,* 612 F.2d 1003 (5th Cir. 1980), for the proposition that an abuse of

**19.** Although we think Potts' dismissal of his first petition is relevant in determining abuse with respect to the second petition, we conclude below that evidence with respect to any reason of justification for Potts' actions must also be considered. It is unthinkable that a single dismissal, which is allowed routinely to all civil litigants under Rule 41(a), could, by itself, and in the absence of proof of intent to litigate in piecemeal fashion or to vex, harass or delay, constitute an abuse with respect to a subsequent petition. In the instant case on remand, the fact of the dismissal of the first habeas petition will be relevant evidence on the abuse issue, along with evidence of any motivation or justification therefor, including any possible good faith belief that he had a one-time right to dismiss under Rule 41(a).

**20.** For purposes of the discussion in this section, we assume *arguendo* that Potts' waiver was knowing and voluntary. Below we conclude that the district court's finding of voluntariness must be vacated and that on remand the issue of the waiver must be the subject of an evidentiary hearing.

the writ is present where there has been "'an intentional relinquishment or abandonment of a known right or privilege.'" *Paprskar*, 612 F.2d at 1006, quoting *Fay v. Noia*, 372 U.S. at 439, 83 S.Ct. at 849.

We believe the district court was lured into error by the citation out of context of the *Paprskar* and *Fay v. Noia* dicta. Full quotation of the pertinent portion of *Fay v. Noia* demonstrates that the Supreme Court saw the doctrine of abuse of the writ as an equitable principle:

[W]e recognize a limited discretion in the federal judge to deny relief to an applicant under certain circumstances. Discretion is implicit in the statutory command that the judge, after granting the writ and holding a hearing of appropriate scope, 'dispose of the matter as law and justice require,' 28 U.S.C. § 2243; and discretion was the flexible concept employed by the federal courts in developing the exhaustion rule. Furthermore, habeas corpus has traditionally been regarded as governed by equitable principles. *United States ex rel. Smith v. Baldi*, 344 U.S. 561, 573, 73 S.Ct. 391, 397, 97 L.Ed. 549, 558 (dissenting opinion). Among them is the principle that a suitor's conduct in relation to the matter at hand may disentitle him to the relief he seeks. Narrowly circumscribed, in conformity to the historical role of the writ of habeas corpus as an effective and imperative remedy for detentions contrary to fundamental law, the principle is unexceptionable. We therefore hold that the federal habeas judge may in his discretion deny relief to an applicant who has deliberately by-passed the orderly procedure of the state courts and in so doing has forfeited his state court remedies.

But we wish to make very clear that this grant of discretion is not to be interpreted as a permission to introduce legal fictions into federal habeas corpus. The classic definition of waiver enunciated in *Johnson v. Zerbst*, 304 U.S. 458, 464, 58

S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466, 146 A.L.R. 357—'an intentional relinquishment or abandonment of a known right or privilege'—furnishes the controlling standard. If a habeas applicant, after consultation with competent counsel or otherwise, understandingly and knowingly forwent the privilege of seeking to vindicate his federal claims in the state courts, whether for strategic, tactical, or any other reasons that can fairly be described as the deliberate by-passing of state procedures, then it is open to the federal court on habeas to deny him all relief if the state courts refused to entertain his federal claims on the merits—though of course only after the federal court has satisfied itself, by holding a hearing or by some other means, of the facts bearing upon the applicant's default. Cf. *Price v. Johnston*, 334 U.S. 266, 291, 68 S.Ct. 1049, 1063, 92 L.Ed. 1356, 1372.

372 U.S. at 438–39, 83 S.Ct. at 848–49. Taken in context, *Fay v. Noia* suggests that a waiver or abandonment must not only be intentional, as tested under *Johnson v. Zerbst*, but must also be under such circumstances "as to justify withholding federal habeas corpus relief." 372 U.S. at 399, 83 S.Ct. at 827. In other words, it must be tested under equitable principles. It must amount to "conduct ... [such as] may disentitle him to the relief he seeks." The reason for petitioner's default or abandonment must be one that "whether for strategic, tactical, or any other reasons ... can fairly be described as the deliberate bypassing of state procedures." The *Fay v. Noia* court faced the issue of whether a state prisoner's intentional failure to pursue his direct appeals in state court should bar his subsequent federal habeas corpus rights.[21] The flavor of the term "deliberate bypassing of state procedures" is revealed by the following quotation:

21. The institutional concern in *Fay v. Noia* was one involving considerations of comity and the language concerning waiver dealt with abandonment of state means to vindicate federal claims. In the instant case the institutional concern is the avoidance of piecemeal litigation and the avoidance of successive applications whose purpose is to vex, harass or delay.

We fully grant ... that the exigencies of federalism warrant a limitation whereby the federal judge has the discretion to deny relief to one who has deliberately sought to subvert or evade the orderly adjudication of his federal defenses in the state courts.

372 U.S. at 433, 83 S.Ct. at 846.

Finally, the actual holding in *Fay v. Noia* demonstrates that the intentional abandonment of a right does not, by itself, constitute an abuse of the writ. The Supreme Court assumed that Noia knowingly chose to forego his right of direct appeal in state court; however, because this choice was made to avoid the risk of a death sentence—should Noia's conviction have been overturned on the state appeal and a retrial ordered—the Supreme Court held that: "Under no reasonable view can the state's version of Noia's reason for not appealing support an inference of deliberate bypassing of the state court system." 372 U.S. at 439, 83 S.Ct. at 849. Thus, in *Fay v. Noia* itself, there was an intelligent abandonment, but the Supreme Court held, in light of Noia's reasons for that choice, that his actions did not constitute a "deliberate circumvention of state procedures." 372 U.S. at 440, 83 S.Ct. at 849. "Noia's failure to appeal cannot under the circumstances be deemed an intelligent and understanding waiver of his right to appeal such as to justify the withholding of federal habeas corpus relief." 372 U.S. at 399, 83 S.Ct. at 827.

As mentioned above, the seminal case is *Sanders, supra,* which expressly formulated "rules to guide the lower federal courts" in dealing with "successive applications for federal habeas corpus and motions under Section 2255." 373 U.S. at 15, 83 S.Ct. at 1077. For clarity of understanding, we repeat the two categories into which *Sanders* divided its guidelines: first, cases in which a subsequent habeas petition raised a ground which had been determined on the merits adversely to the applicant in a prior habeas petition; and second, cases in which a subsequent habeas petition raises a new ground, or the "same ground [that] was

earlier presented but not adjudicated on the merits." 373 U.S. at 17, 83 S.Ct. at 1078.

The instant case is governed by the guidelines set out in *Sanders'* second category. The grounds of Potts' second habeas petition are substantively the same as those in his first habeas petition. However, Potts' first petition was never adjudicated on the merits. The state does not contend otherwise. *Sanders* explains clearly what a denial on the merits means:

The prior denial must have rested on an adjudication of the merits of the ground presented in the subsequent application. *See Hobbs v. Pepersack*, 301 F.2d 875 (CA4th Cir. 1962). This means that if factual issues raised in the prior application, and it was not denied on the basis that the files and records conclusively resolved these issues, an evidentiary hearing was held. *See Motley v. United States*, 230 F.2d 110 (CA5th Cir. 1956); *Hallowell v. United States*, 197 F.2d 926 (CA5th Cir. 1952).

373 U.S. at 16, 83 S.Ct. at 1077. Potts' first petition did raise numerous factual issues; there was no evidentiary hearing and there was no determination on the basis of the files and records in the case; accordingly, there was no adjudication on the merits.

We turn, therefore, to the guidelines enunciated by *Sanders* for second category cases: "Full consideration of the merits of the new application can be avoided *only* if there has been an abuse of the writ." 373 U.S. at 17, 83 S.Ct. at 1078 (emphasis added). It is significant that *Sanders* establishes abuse of the writ as the *only* theory justifying refusal to reach the merits of a "second category" habeas petition, such as Potts'. Therefore, unless an intentional waiver or abandonment of one's habeas rights also constitutes a *per se* abuse, it is clear that the district court erred in denying the writ on that basis alone.

Confirming our discussion of *Fay v. Noia, Sanders* clearly places the abuse doctrine in context as one "governed by equitable principles," i. e., "a suitor's conduct ... may disentitle him to the relief he seeks." 373 U.S. at 17, 83 S.Ct. at 1078 (quoting from

*Fay v. Noia,* 372 U.S. at 438, 83 S.Ct. at 848). The following phrases provide some hint of what the Supreme Court deemed to constitute an abuse: "Nothing in the traditions of habeas corpus requires the federal courts to tolerate needless piecemeal litigation, or to entertain collateral proceedings whose only purpose is to vex, harass, or delay." 373 U.S. at 18, 83 S.Ct. at 1078. Significantly, the *Sanders'* court expressly incorporates the principles developed in *Fay v. Noia,* 372 U.S. at 438–40, 83 S.Ct. at 848–849 (quoted in part above), and *Townsend v. Sain,* 372 U.S. at 317, 83 S.Ct. at 1078, as the "test governing whether a second or successive application may be deemed an abuse ... of the writ." We have seen that *Fay v. Noia* placed the abuse doctrine in its context as an equitable principle. *Townsend v. Sain* referred to the *Fay v. Noia* standard as one of "inexcusable neglect." 372 U.S. at 317; 83 S.Ct. at 759. For the instant case, however, the most significant aspect of the *Fay v. Noia* elaboration of the tests governing the abuse doctrine is the holding itself that Noia's intentional abandonment of his direct state appeal right did not constitute an abuse because his actions were justified.

To support its conclusion that abandonment alone is sufficient to find abuse, the district court also relied upon the language of *Sanders* stating that if a prisoner deliberately abandons a ground, as did the petitioner in *Wong Doo v. United States,* 265 U.S. 239, 44 S.Ct. 524, 68 L.Ed. 999 (1924), an abuse might be found. We believe the district court misread this portion of *Sanders.* The cite to *Wong Doo* occurs in the paragraph discussing the need to look to the petitioner's conduct and equitable principles in determining abuse. This is the paragraph that ends with the oft-cited standard that abuse is to be found if there is a purpose to litigate in piecemeal fashion or to vex, harass or delay. Earlier in the *Sanders* opinion, the Court characterized Wong Doo's actions as being in bad faith. 373 U.S. at 10, 83 S.Ct. at 1074. Moreover,

the actual opinion in *Wong Doo* demonstrates the Court's belief that Wong Doo's actions were in bad faith. The Supreme Court held that Wong Doo's failure to produce evidence at his first habeas hearing with respect to a ground alleged, and his reservation of that ground to support a subsequent habeas petition, demonstrated a lack of good faith and amounted to an abuse of the writ. The Supreme Court stated: "The petitioner had full opportunity to offer proof of [the ground] at the hearing on the first petition; and, if he was intending to rely on that ground, good faith required that he produce the proof then. To reserve the proof for use in attempting to support a later petition, if the first failed, was to make an abuse of the writ of habeas corpus. *No reason for not presenting the proof at the outset is offered.*" 265 U.S. at 241, 44 S.Ct. at 525 (emphasis added). This passage, read in its entirety, indicates the Supreme Court's conviction of the bad faith of the petitioner in *Wong Doo.* Moreover, the last sentence in the above quotation is the factor which distinguishes the instant case. Here, Potts alleged reasons justifying his actions, requested a hearing thereon, and proffered evidence. The treatment of *Wong Doo, supra,* in subsequent Supreme Court cases emphasizes the significance of the last sentence in the above quotation, and makes clear that *Wong Doo* is consistent with the notion that the abuse doctrine is an equitable principle. See *Price v. Johnston,* 334 U.S. at 291, 68 S.Ct. at 1063; *Sanders,* 373 U.S. at 17–18, 83 S.Ct. at 1078–79.

This circuit recently announced, in a slightly different context, the very principles which we have deduced from *Sanders* and *Fay v. Noia.* In *Sosa v. United States,* 550 F.2d 244 (5th Cir. 1977), a federal prisoner intentionally and voluntarily dismissed his direct appeal from his conviction and sentence in district court. The issue we faced there was whether this "deliberate bypass" barred his subsequent § 2255 motion.[22] In holding that the § 2255 motion

---

**22.** Although *Sosa* involved a § 2255 motion, this circuit has indicated that holdings respect-   ing deliberate bypass in the context of federal habeas and § 2255 motions are equally applica-

was not barred, we recognized that "the term 'deliberate bypass' is not self-executing . . . it encapsulates an equitable doctrine." 550 F.2d at 247. We said:

> Our own jurisprudence traces a similar course, and consistently returns to the holding that the *motivation or reason for the failure to appeal,* and not the mere data that an appeal was not taken or completed, determines whether a section 2255 motion ought to be entertained.

550 F.2d at 247 (emphasis added). We also said:

> Our cases firmly reject any rigid application of the rule against surrogate appeals. Instead, they establish the principle that habeas will not be permitted to substitute for an appeal when the choice to seek habeas is made in order to seize some legal or tactical advantage for the defendant. No such ulterior purpose has been shown to have directed Sosa's actions.

550 F.2d at 248–49.[23]

Although none of the authorities discussed above involve the precise context of the instant case—an abandonment of all

federal habeas corpus rights pursuant to the withdrawal of a first habeas petition— the guidelines provided by *Sanders* clearly control. The instant case is encompassed within *Sanders'* second category, *i. e.,* presenting in a subsequent habeas petition the "same ground . . . earlier presented but not adjudicated on the merits." 373 U.S. at 17, 83 S.Ct. at 1078. Accordingly, we conclude that the equitable principles above discussed provide the standards governing the determination of abuse in this case. On the basis of the foregoing authority, we reverse the district court's legal conclusion that a knowing and intentional waiver necessarily renders any subsequent habeas petition an abuse of the writ, without regard to reasons which might be offered to justify the applicant's conduct. Our conclusion that the district court erred by not considering the reasons proffered by Potts to justify his actions is bolstered by our discussion in the next section of the cases holding that a prisoner must be afforded an opportunity to explain an alleged abuse. We remand with instructions that the district court hold an evidentiary hearing to inquire into the rea-

---

ble to one another. *McKnight v. United States,* 507 F.2d 1034 (5th Cir. 1975). Obviously the institutional concerns in *Sosa* are different from those we now face. There we addressed the institutional concern that § 2255 motions not be used as a substitute for a direct appeal, whereas in the instant case the institutional concern is avoidance of needless piecemeal litigation and the avoidance of collateral proceedings whose purpose is to vex, harass or delay. Although the nature of the institutional concern is different, the overriding principle in both kinds of cases is that habeas corpus is governed by equitable principles.

**23.** Other cases in this circuit echo the statement in *Sosa. Montgomery v. Hopper,* 488 F.2d 877, 879 (5th Cir. 1973) ("Not even an outright failure to file an appeal would, of itself, constitute a deliberate bypass in the absence of clear proof that the decision not to appeal was made knowingly and understandingly *in order to secure some benefit to the petitioner.*" (emphasis added)); *McKnight v. United States,* 507 F.2d 1034, 1036 (5th Cir. 1975) ("[T]he emphasis is not merely on the fact that an appeal was not taken, but rather on why the appeal was not taken."); *Buckelew v. United States,* 575 F.2d 515, 519 (5th Cir. 1978) ("[P]roof of bypass typically involves a showing that the prisoner secured some tacti-

cal advantage by not pressing his claim earlier."); *see also Haley v. Estelle,* 632 F.2d 1273, 1275 (5th Cir., 1980) ("The principle behind Rule 9(b) is to dismiss those petitions that constitute 'needless' piecemeal litigation or whose 'purpose is to vex, harass, or delay.' "); and *Strickland v. Hopper,* 571 F.2d 275 (5th Cir. 1978), *cert. denied* 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978) (where this court affirmed the denial of a federal habeas corpus petition finding that the state prisoner had deliberately bypassed the orderly procedures of the state courts when he escaped and became a fugitive from justice, thus frustrating his state court motion for new trial. Although the court did not expressly speak in terms of equitable principles, the decision is clearly consistent therewith). *Cf. Wilwording v. Swenson,* 502 F.2d 844 (8th Cir. 1974), *cert. denied* 420 U.S. 912, 95 S.Ct. 835, 42 L.Ed.2d 843 (1975).

Although Potts arguably has achieved a tactical advantage, *i. e.,* the delay of his execution, there is evidence in the record he neither intended nor wanted this result. The evidentiary hearing on remand will afford an opportunity to inquire into this and other aspects of Potts' actions and test this conduct against the equitable principles comprising the abuse doctrine.

sons alleged by Potts to justify his actions, and to make findings of fact with respect thereto.

## WHETHER A HEARING SHOULD HAVE BEEN HELD ON ISSUE OF ABUSE

■ During the hearing on June 26, Potts' attorneys maintained that if the district court was prepared to reject his second petitions for being an abuse of the writ, they had a right to present evidence explaining Potts' action and rebutting the state's pleading of abuse. The district court permitted Potts' attorneys a brief offer of proof in which they quickly described various factors on which they were prepared to present evidence, some of which went to the voluntariness of Potts' withdrawal of his first petition. They also stated that Potts himself was prepared to explain his actions. The district court, however, refused to grant an evidentiary hearing on any issue relevant to abuse. On the basis of the evidence addressed in the "next friends" petition and in the June 10 hearing, the district judge was convinced that Potts had made an intentional and voluntary waiver of his right to federal habeas, and that this meant any subsequent petition was an abuse. We conclude that the court should have granted a hearing on the issue of abuse. Our holding in this matter is divided into two parts. In the first part, we discuss the law respecting the need for an evidentiary hearing with respect to the issue of abuse even assuming Potts' abandonment was indeed knowing and voluntary. In the second part, we discuss the need for an evidentiary hearing to determine the voluntariness of Potts' abandonment. By separating the issues to be determined in an evidentiary hearing into these two contexts, we hope to clarify the district court's task on remand.

(i) Hearing on issue of abuse.

■ Even if Potts' waiver and abandonment were as a matter of fact knowing and voluntary, an evidentiary hearing in this case is nevertheless necessary to determine whether an abuse of the writ has occurred.

This holding follows from our holding above that an intentional abandonment does not, by itself, constitute an abuse, and from the cases discussed below holding that a petitioner must have an opportunity to rebut and explain any allegation of abuse. Such a procedure is consistent with the concern for the equities of a prisoner's action when abuse is alleged.

Prior law indicates that a petitioner's right to rebut or explain any alleged abuse is broad and does not depend upon the type of abuse alleged. *Price v. Johnston*, 334 U.S. 266, 292, 68 S.Ct. 1049, 1063, 92 L.Ed. 1356, 1373 (1948), establishes that the government has the burden of first pleading abuse of the writ, a burden met here. *See also Sanders v. United States, supra.* It further establishes that once the government has met its burden by pleading abuse of the writ, the petitioner must be afforded an opportunity to present evidence rebutting the government's pleading:

> Once a particular abuse has been alleged, the prisoner has the burden of answering that allegation and of proving that he has not abused the writ. If the answer is inadequate, the court may dismiss the petition without further proceedings. But if there is a substantial conflict, a hearing may be necessary to determine the actual facts. Appropriate findings and conclusions of law can then be made. In this way an adequate record may be established so that appellate courts can determine the precise basis of the district court's action, which is often shrouded in ambiguity where a petition is dismissed without an expressed reason. And the prisoner is given a fairer opportunity to meet all possible objections to the filing of his petition.

*Price v. Johnston*, 334 U.S. at 292–93, 68 S.Ct. at 1063–64. We agree with the Fourth Circuit in *Johnson v. Copinger*, 420 F.2d 395 (4th Cir. 1969), which held that the obligation placed upon a petitioner to demonstrate that his action is excusable and does not amount to an abuse of the writ, carries a concomitant obligation on the part of the court to afford a petitioner an oppor-

tunity to make his explanation, if he has one. 420 F.2d at 399. *Fay v. Noia*, relying on *Price v. Johnston*, indicated that a federal court may find a deliberate bypass of state procedures only if the federal court is satisfied by a hearing or some other means of the facts surrounding the applicant's default. 372 U.S. at 439, 83 S.Ct. at 849. *See also Sanders v. United States*, 373 U.S. at 20–21, 83 S.Ct. at 1079–80, remanding for a hearing on the abuse issue raised there. Moreover, the *Advisory Committee Note* with respect to Rule 9(b) indicated that it is expected that a petitioner would have an opportunity to explain any alleged abuse, citing *Johnson v. Copinger, supra*.[24] To aid in this endeavor, the drafters of the Rules appended to the Rules a recommended form by which a court could inform a petitioner his application was in danger of being dismissed as an abuse, thus affording him an opportunity to present mitigating facts.[25]

This circuit has not been insensitive to the requirement that a federal habeas or § 2255 petitioner must have an opportunity to rebut an allegation of abuse. Where there is alleged a waiver of a constitutional right because of a deliberate bypass, the most frequently claimed form of abuse, this circuit has many times remanded cases to district courts for an evidentiary hearing on the issue of a bypass.[26] Indeed, with respect to whether there has been a waiver by deliberate bypass, this circuit has stated that the standards for finding such a waiver are rigid. *Buckelew v. United States*, 575 F.2d 515, 519 (5th Cir. 1978); *Montgomery v. Hopper*, 488 F.2d 877 (5th Cir. 1973).

An exception we have found to this opportunity to rebut an alleged abuse is the rule derived in § 2255 cases that an evidentiary hearing on a deliberate bypass issue need not be held when the record has sufficient evidentiary development to clearly show a deliberate bypass. *Coco v. United States*, 569 F.2d 367 (5th Cir. 1978); *Buckelew v. United States*, 575 F.2d 215 (5th Cir. 1978) (dictum). We have applied the same rule in the context of a deliberate bypass of state procedure where the record clearly indicates a deliberate bypass. *Johnston v. Estelle*, 548 F.2d 1238 (5th Cir.), *cert. denied* 434 U.S. 850, 98 S.Ct. 161, 54 L.Ed.2d 118 (1977).

We conclude that the record in the instant case does not clearly show an abuse, and accordingly, we hold that the district court erred in failing to hold an evidentiary hearing.[27] Potts has alleged reasons to jus-

---

24. The Fourth Circuit in *Johnson v. Copinger*, where a different ground for abuse was alleged, also stated:

> Therefore, we hold that in a case in which the district judge believes, after examining the petition for habeas corpus, that the petitioner may have in an earlier petition deliberately withheld grounds then available to him, the judge may not dismiss the petition on the ground of abuse of the writ without first giving notice to the petitioner that such action is contemplated and affording him an opportunity to amend his petition to offer any explanation he may have which would justify his earlier omission or show that the omission was not deliberate, or that the grounds were not then known to him.

420 F.2d at 399.

25. The forms appended by Rules for Governing Section 2254 Cases have not been used in any of Potts' petitions. Instead, his petitions apparently have been prepared by attorneys, using the *pro se* petition form with a space at the end for his signature.

26. *McKnight v. United States*, 507 F.2d 1034 (5th Cir. 1975); *Bailey v. State of Alabama*, 505 F.2d 1024 (5th Cir. 1975); *Morris v. United States*, 503 F.2d 457 (5th Cir. 1974); *Montgomery v. Hopper*, 488 F.2d 877 (5th Cir. 1973); *Collier v. Estelle*, 488 F.2d 929 (5th Cir. 1974); *Montgomery v. United States*, 469 F.2d 148 (5th Cir. 1972); *Montgomery v. Caldwell*, 457 F.2d 767 (5th Cir. 1972); *Johnson v. Smith*, 449 F.2d 127 (5th Cir. 1971); *Bonaparte v. Smith*, 448 F.2d 385 (5th Cir. 1971). Other circuits also have remanded cases for evidentiary hearings concerning waiver by deliberate bypass. *United States v. Barnes*, 610 F.2d 888 (D.C. Cir. 1980); *Zarola v. Crowen*, 433 F.2d 335 (9th Cir. 1970). *See also Haley v. Estelle*, 632 F.2d 1273, 1276 (5th Cir., 1980) ("Where substantial conflict exists, it may be necessary to hold a hearing to determine the actual facts.")

27. Of significance in this regard is the fact that Potts was in the courtroom on June 26, unlike most prisoners who cannot be brought to court without inconvenience. Because of the seriousness of Potts' sentence and because of the slight inconvenience to have Potts explain his actions at the June 26 hearing, the duty to give a prisoner the opportunity to rebut an allegation of abuse becomes even more stringent.

tify his actions, has requested a hearing, and has even made an abbreviated proffer of evidence. For example, at the June 10 hearing, before the issue of abuse was even raised, Potts gave a reason for withdrawing his first habeas petition, which the district court on remand may well find to be plausible, and which would be evidence of an absence of abuse. He stated that he filed the first habeas petition to comfort his brother, and in the belief that no stay would be granted. This explanation is consistent with Potts' refusal to pursue any attack on his conviction from late 1979, until June 4, 1980, and reflects what the district court on remand may well find to be a natural familial concern considering the emotional circumstances in which Potts found himself. Indeed, the district court gave as one reason for finding Potts competent to dismiss his first petition his explanation that he filed the petition solely to comfort his brother. We do not believe that the chronology of the events—the fact that the first petition was filed on the day before the scheduled June 5 execution date and the fact that the second petition was filed on June 25, six days before the July 1 execution date—clearly shows an abuse in this case where the above-mentioned and other explanations have been proffered to justify Potts' actions, and especially when the emotionally charged atmosphere surrounding Potts is considered. Nothing in the record clearly shows that the alleged justifications are implausible on their face. We conclude, therefore, that the district court should on remand afford Potts an opportunity to rebut the state's allegation of abuse, that the district court should hold an evidentiary hearing to inquire into the explanations offered by Potts to justify his actions and to hear any evidence in opposition which the state might offer, and that the district court should, applying the equitable principles set forth in this opinion, make findings of fact and conclusions of law as to whether or not Potts has abused the writ of habeas corpus.

(ii) Hearing on issue of voluntariness

For the sake of the preceding arguments, we have assumed that Potts' abandonment of federal habeas rights was knowing and voluntary. Before the district court in his second petition and before this court, Potts has maintained that his abandonment was not voluntary because of, *inter alia*, harassment from prison authorities, inadequate medical care and constant pain from a bullet wound, discontent of family members at the prospect of Potts' continued incarceration, and the "circus atmosphere" surrounding his case. Although Potts' attorneys requested an evidentiary hearing on these factual allegations relevant to voluntariness, and made an offer of proof of evidence they were then prepared to present on the issue of voluntariness, the district court refused to grant a hearing on this issue. The district court, in its order of June 26, held that on the basis of the evidence in the "next friends" petitions and in the June 10 hearing, there could be no question but that Potts had made an intentional, knowing and voluntary waiver of his right to federal habeas. In relying on evidence in the "next friends" petition and in refusing to grant Potts an evidentiary hearing on the issue of voluntariness, the court erred.

In his brief, Potts, without citation of authority, argues that the district court's reliance on facts adduced at the "next friends" proceeding, which Potts had not authorized and at which he had neither been present nor represented by counsel, was improper. The state, also without citation of authority, relies upon the fact that the district court heard evidence respecting Potts' competence at the "next friends" hearing to bolster the district court's finding of a voluntary abandonment. The court's June 26 order does not indicate to what extent the district court relied on evidence presented in the "next friends" hearing, but does clearly indicate that such evidence was considered in finding Potts' actions on June 10 to be voluntary. We are not told whether the court looked to the testimony of the psychologist, the documentary evidence, or the videotape of Potts which was introduced in the "next friends"

hearing.[28] Nor are we told the content of this evidence. Potts was not a party to the "next friends" petition, and the state has made no claim that Potts is collaterally estopped from contesting any issue decided in the "next friends" proceedings or that judicial notice[29] of such evidence was appropriate.[30] Nor did the district court offer any justification for its reliance on evidence presented in a suit to which Potts was not a party. We conclude the court erred in relying on evidence presented in the "next friends" hearing and that such error requires a remand.

Moreover, the district court should have granted a hearing on the issue of the voluntariness of Potts' abandonment, because Potts on June 26 made extensive factual allegations which were not contradicted by his testimony in the June 10 hearing and which raised issues outside the record and not resolvable through the personal knowledge of the district court judge. Among these allegations were Potts' assertion of harassment from prison authorities, pressure from some family members to dismiss his habeas petitions, constant pain resulting from a bullet wound and inadequate medical care of the wound, and a "circus atmosphere" surrounding his case. Our holding on this point is grounded in *Sanders* as well as cases dealing with the analogous situation where a federal prisoner subsequently attacks his guilty plea in a § 2255 motion before the same judge who accepted the guilty plea after duly complying with Fed. R.Crim.P. 11.

In *Sanders*, the petitioner attacked his waiver of indictment and guilty plea before the same judge who accepted the waiver and plea on grounds that he was mentally incompetent because of narcotics administered to him before his appearance before the court. The petitioner submitted an affidavit in support of his allegation of incompetency. The Supreme Court held that the petitioner was entitled to a hearing since he alleged matters outside the record. Although the Court acknowledged that the petitioner's actions before the district court in waiving indictment may have appeared in all respects normal, the record there still did not conclusively show his allegation to be groundless. The Court also found corroboration of the petitioner's claim in the fact that petitioner asked for treatment as an addict during his waiver of indictment.

▮ There is further support for our conclusion in the analogous situation where a federal prisoner attempts to attack a guilty plea in a § 2255 motion filed with the same judge who took the guilty plea after following the procedure of Fed.R.Crim.P. 11. Frequently, federal prisoners who swore their plea was voluntary and testified as to facts surrounding that plea, will later attack the plea as being involuntary and attempt to recant the testimony given at the Rule 11 proceeding. The parallels to the instant case are obvious.[31] In the context

28. During the June 10 hearing, the district court asked Potts whether the views he was expressing on June 10 were the same as those in the videotape of his June 2 news conference. Potts gave an ambiguous answer to this question. (Tr., June 10, 1980, hearing, p. 11). Accordingly, we are unable to determine whether Potts adopted the views expressed in the videotape as his own. Regardless of this ambiguity, the fact remains that we do not know whether the district court relied on the documentary evidence and psychologist's testimony in the "next friends" hearing as well.

29. "Judicial notice is generally defined as a judge's utilization of knowledge other than that derived from formal evidentiary proof in the pending case." 1 Weinstein, *Evidence* ʻ 200 [01] (1979).

30. We do not suggest that either collateral estoppel or judicial notice would be appropriate. On the contrary, we would anticipate serious problems with either theory in the context of this case. However, since neither theory is asserted by the state, we express no opinion thereon.

31. While the cases in which a § 2255 petitioner attacks a guilty plea have not involved the problem of abuse of the writ, we are impressed by the fact that a hearing is nevertheless often required in this context where a trial judge has first-hand and extensive knowledge of the facts. In the context of a question of abuse of the writ, where concerns of finality are not so strong, there very well may be more reason to give the petitioner a hearing to attack the voluntariness of any act relevant to the abuse question.

of a § 2255 motion attacking a guilty plea, we have held that ordinarily a defendant will not be heard to refute testimony given under oath when pleading guilty. *United States v. Sanderson*, 595 F.2d 1021 (5th Cir. 1979). Nevertheless, in this circuit, as well as in the Supreme Court, when a § 2255 petitioner sets out detailed factual allegations regarding alleged circumstances which may go to the voluntariness of his plea, the petitioner is entitled to a hearing unless the motion and the files on record conclusively show the petitioner is entitled to no relief. *Fontaine v. United States*, 411 U.S. 213, 93 S.Ct. 1461, 36 L.Ed.2d 169 (1973); *Machibroda v. United States*, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); *United States v. McCord*, 618 F.2d 389 (5th Cir. 1980); *United States v. Sanderson*, 595 F.2d 1021 (5th Cir. 1979); *Dugan v. United States*, 521 F.2d 231 (5th Cir. 1975); *cf. McKenzie v. Wainwright*, 632 F.2d 649 (5th Cir., 1980) and *Bryan v. United States*, 492 F.2d 775 (5th Cir.), *cert. denied* 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674 (1974). Typically, this circuit has found some form of corroboration to a petitioner's allegations before requiring a hearing. *United States v. McCord, supra; United States v. Sanderson, supra; Dugan v. United States, supra.*

As in both *Sanders* and the analogous cases involving attacks on guilty pleas, Potts has alleged matters which cannot be concluded from the record. Although Potts at one point in the June 10 hearing denied coercion as a factor in his dismissal of his first petitions, he is now alleging harassment by prison authorities, a matter upon which the record is silent. The record does not show what family pressures may have affected Potts, other than his allegation in his brief that his mother told him he was wrong in pursuing an appeal. Nor have we any indication of the medical treatment he has received while in prison or the treatment he could expect should his death penalties be overturned. Nothing Potts said in the June 10 hearing addressed these allegations, and an evidentiary hearing will be necessary if they are to be substantiated or refuted.

We also believe that there is some corroboration of Potts' allegations of harassment from prison authorities in his June 10 hearing.[32] When asked specifically whether he was abandoning his claims because of certain actions by prison authorities, Potts acknowledged that "some things did happen" and he requested the court's help to make sure they would not happen again, but insisted that he was dismissing his petitions because they had been filed only to console his brother. (Tr., June 10, 1980, pp. 35–36).

Because the district court erroneously relied on evidence adduced in a case to which Potts was not a party, and because Potts has alleged facts—relevant to the issue of voluntariness and raising issues outside the record and not resolvable through the personal knowledge of the district judge—which require an evidentiary hearing,[33] we remand to the district court for an evidentiary hearing on whether Potts' abandonment of his federal habeas corpus rights was voluntary.[34]

### ENDS OF JUSTICE

■ Although we have focused our attention on the proper considerations for a

32. While not providing clear corroboration of Potts' allegation of family discontent over his decision to file his first petition, the fact that Potts wrote his June 6 letter dismissing his first petition in the presence of his mother and has had frequent contact with his mother (Tr., June 10, 1980, hearing, p. 26), and wished to consult with family members before filing his second petition, provides some credibility to his allegation of family pressure.

33. As we noted above in note 27, Potts and other witnesses were present in the courtroom on June 26 and were prepared to testify concerning the voluntariness of Potts' abandonment. Because of the seriousness of the sentence Potts was attacking and because it would have inconvenienced the district court only slightly to take evidence on this issue during the June 26 hearing, there was much less reason for the court in this case to rely solely on Potts' sworn testimony of June 10.

34. Although it may be the case that the evidence developed at the evidentiary hearing is insufficient to demonstrate an involuntary abandonment, the same evidence nevertheless may be relevant on the issue of abuse and whether some reason justifying Potts' action exists.

determination of an abuse of the writ, we are cognizant of the requirement in *Sanders* that even if a successive petition could otherwise be dismissed without consideration on the merits, the ends of justice may nevertheless induce—and may even require—the district judge to exercise his discretion to address the merits. *Sanders v. United States*, 373 U.S. at 18–19, 83 S.Ct. at 1078–79. There are weighty factors in the instant case, in addition to those we have considered with respect to abuse, which are relevant as to whether the ends of justice would be served by addressing Potts' second petition. The fact that a man's life is at stake is relevant. Also relevant is the fact that Potts would be executed without ever having had any federal review of the merits of the alleged constitutional defects in his conviction and sentence. The district judge may weigh these consequences against the degree of fault or misconduct which he might find on remand. Also relevant is any possible prejudice to the state, *e. g.*, whether the state has lost important transcripts or witnesses necessary to rebut Potts' substantive claims. We express no opinion with respect to whether the ends of justice require the district court to address Potts' second petitions, preferring that the district court on remand address the question in the first instance, if necessary.

## CONCLUSION

We conclude that a remand for an evidentiary hearing is necessary with respect to Potts' second set of petitions, numbered 80–7476 and 80–7477 in this court. Although we reject Potts' argument based on Fed.R.Civ.P. 41(a), we agree that Potts' intentional abandonment does not, by itself, constitute an abuse of the writ of habeas corpus. Rather, Potts' actions must be tested against the equitable principles which we have deduced from prior cases, primarily *Sanders v. United States, supra*, and *Fay v. Noia, supra*. The district court on remand shall hold an evidentiary hearing on the abuse issue generally and on the sub-issue involving voluntariness, shall make findings of fact and conclusions of law—applying the applicable equitable principles to the totality of the facts and circumstances. Finally, the district court shall, if necessary, address the ends of justice issue.

With respect to the appeal of his first two petitions, numbered 80–7664 and 80–7665 in this court, Potts applied to this court for a certificate of probable cause only as a precautionary measure should the dismissal of the first petitions be deemed anything other than a voluntary dismissal under Fed.R. Civ.P. 41(a). No briefs have been filed with respect to those appeals, but instead Potts' attorneys evidently informed the clerk of this court of their intention to file a motion to adopt the briefs in numbers 80–7476 and 80–7477, and of the likelihood of their filing supplemental briefs. No such supplemental briefs have been filed. Considering the briefs in 80–7476 and 80–7477, appealing the dismissal of the second petition, the only possible assertion of error in 80–7664 and 80–7665 relates to the issue of whether Potts' abandonment of his first petition was voluntary. We note that this issue will be determined when the district court considers the second petition on remand. If Potts is successful, he will have a determination on the merits of all the claims raised in the first petition. Therefore, this issue provides no need to prolong the life of the first petition. We note also that Potts expressly does not argue, either in brief or at oral argument, that he was incompetent at the time he dismissed his first petition, and thus incapable of abandoning it. Seeing no error, we affirm the district court's dismissal of the petitions in 80–7664 and 80–7665.

With respect to docket numbers 80–7664 and 80–7665, AFFIRMED.

With respect to docket numbers 80–7476 and 80–7477, VACATED AND REMANDED.

THOMAS A. CLARK, Circuit Judge, specially concurring:

I concur.

I agree with and concur in Judge Anderson's scholarly and thoughtful opinion. I think that the remand provided for in his opinion is the least that is required under

the circumstances; I would go further and require a hearing on the merits because I believe the facts and the ends of justice overwhelmingly compel the granting of a habeas corpus hearing on the merits. I would therefore hold that it is unnecessary to conduct a hearing in order to determine whether a later hearing on the merits of Potts' constitutional claims should be had.

We are balancing (1) the right of a prisoner to a habeas corpus hearing one month after he waived such a right, against (2) the possibility that the state might have suffered substantial prejudice if the hearing were granted, and (3) the district court's being vexed or harassed in the performance of its functions or the prisoner's obtaining a delay of his death sentence.

Judge Anderson has forcefully elucidated the preeminence of habeas corpus in our country's criminal law procedure. Here the prisoner is sentenced to die; he has not had a federal habeas corpus hearing; the record clearly reflects a tortured and vacillating mental state that has bent to differing pressures from his brother, his mother, his attorneys, and the news media, not to consider the alleged maltreatment in prison about which no evidence has been taken in the instant case. One cannot truly be surprised that the prisoner at one time wanted to hurry his own execution and at another time wanted to live and seek relief for claimed deprivation of constitutional rights.

I read the holding in *Sanders* to require an express finding that Potts had the specific intent to vex, harass, or delay in withdrawing the first petition before he could be denied a hearing on the second petition. I see no evidence of such intent in the record that has been made up to this time.

Alternatively, I can only conclude that the ends of justice demand a hearing on the second petition. Assuming no prejudice to the state, we have on the one hand the possibility of intent to vex, harass, and delay—on the other, death by electrocution without determining if the prisoner was deprived of his rights. The ends of justice require that the district court fully consider the prisoner's constitutional claims under these extreme circumstances. To do otherwise would always leave unanswered the questions—Did Potts intend to vex, harass, and delay? Was Potts deprived of any of his federal constitutional rights? Was it appropriate to take his life by answering the first question yes and avoiding an answer to the latter question? The price of granting a full hearing is too small when balancing these considerations.

LEWIS R. MORGAN, Circuit Judge, dissenting.

I dissent from the majority opinion vacating the district court's order dismissing the appellant's petitions. I would affirm the order of the district court. The court below found there was an intentional, knowing and unequivocal relinquishment of a known right which constituted a waiver of federal habeas corpus review. Under the evidence, that there was a waiver and an abandonment is established beyond any doubt. Seeking another stay and consideration of substantively identical successive petitions constitutes an abuse of the writ as defined by *Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148. I agree with the district court order that there must be an end to litigation and that such frustration of the legal processes should not be allowed to continue.